UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SPIN MASTER, LTD,<br><br>                    Plaintiff,<br><br>          v.<br><br>AOMORE-US ET AL.,<br><br>                    Defendants. | 23 Civ. 7099 (DEH)<br><br>**OPINION<br>AND ORDER** |

DALE E. HO, United States District Judge:

This action concerns alleged infringement of patented technology used in wall climbing toy vehicles. Plaintiff Spin Master, LTD ("Plaintiff" or "Spin Master") initially sought a preliminary injunction against various online sellers, primarily operating out of China, based on alleged infringement of the '897 Patent, of which Spin Master is the exclusive licensee. ECF No. 142. In July 2025, before the Court ruled on Plaintiff's motion, the '897 Patent expired. Spin Master subsequently supplemented its Motion for Preliminary Injunction in October 2025, on the grounds that Defendants are allegedly infringing upon a different patent—the '755 Patent—of which Spin Master is also the exclusive licensee. ECF No. 177. For the reasons explained below, the Court **GRANTS** Spin Master's Motion for a Preliminary Injunction.

## BACKGROUND

This case was initiated in August 2023, when Spin Master filed its original complaint alleging Defendants' toy vehicles sold on Amazon and Walmart.com infringe upon various patents—including U.S. Patent No. 9,675,897 ("the '897 Patent") and U.S. Patent No. 7,753,755 ("the '755 Patent")—of which Plaintiff alleges it is the exclusive licensee. ECF No. 1 at 1-6. Approximately two months after filing its complaint, Spin Master requested that this Court issue a Temporary Restraining Order ("TRO") to freeze Defendants' U.S.-based assets and accounts.

ECF No. 33. The Court denied the Motion for a TRO, but allowed the parties to proceed with briefing on a motion for preliminary injunction. ECF No. 48. After a subsequent hearing, the Court denied the Motion for Preliminary Injunction without prejudice due to improper service on the Defendants. ECF No. 126. In November 2024, after service had been properly effectuated, Plaintiff renewed its Motion for Preliminary Injunction, arguing that Defendants infringed on Claim 1 of the '897 Patent. ECF No. 136. Before the Court ruled on the renewed motion, however, the '897 Patent expired. *See* ECF No. 164. In September 2025, Plaintiff moved to supplement their briefing on the preliminary injunction to substitute Claims 1, 6, and 21 of the '755 Patent in place of Claim 1 of the '897 Patent. *Id.* The Court granted that application, ECF No. 170, and, after the parties jointly submitted a proposed schedule, set dates for briefing and a hearing on the matter. ECF No. 172. On December 18, 2025, the Court heard argument.

Spin Master argues that the products it accuses of infringement (the "Accused Products") meet the limitations of Claims 1, 6, and 21 of the '755 Patent and that the infringement is causing ongoing irreparable harm. According to Spin Master, the Accused Products have flooded the U.S. market, forcing Spin Master "to maintain artificially low prices, redesign its products, and absorb irretrievable losses in market share, brand distinction, and patent value." Pl.'s Suppl. Mem. Law Supp. Prelim. Inj. ("Pl.'s Supp.") 1-2, ECF No. 177. In support of its motion, Spin Master submitted the declarations of Kara M. Cormier, an attorney representing Spin Master, ECF No. 178, and of Susanne Teixeira, Vice President of Legal Affairs and Intellectual Property at Spin Master, ECF No. 180, as well as various exhibits.

For their part, Defendants contend that Spin Master cannot show irreparable harm because: (1) Spin Master's various delays in seeking emergency relief undermine any notion of irreparable harm; (2) there is no nexus between any purported harm and the '755 Patent; and (3) any purported harm can be remedied through monetary damages. Defs.' Suppl. Mem. Law Opp'n Prelim. Inj.

2

("Defs.' Opp'n") 1, ECF No. 183.  Defendants also argue that the Accused Products do not infringe on the '755 Patent because they do not use the technology that the '755 Patent describes and that the '755 Patent is invalid.  *Id.* at 1-2.  Defendants attached the declarations of Joshua Levine, a mechanical engineer, ECF No. 184, and Sandra A. Hudak, an attorney representing Defendants, ECF No. 185, as well as various exhibits.

**PRELIMINARY FINDINGS OF FACT**

"On a motion for preliminary injunction, if essential facts are in dispute, there must be a hearing and appropriate findings of fact must be made."  *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Stucco Sys's., LLC*, 289 F. Supp. 3d 457, 463 (S.D.N.Y. 2018).[1]  "After the evidentiary hearing is conducted, pursuant to Federal Rules of Civil Procedure 52(a) and 65(d), the Court is required to set forth the findings of fact and conclusions of law which support its order."  *Telebrands Corp. v. Guangzhou Alpaca Home Furnishing Co.*, No. 25 Civ. 3646, 2025 WL 1591970, at *2 (S.D.N.Y. June 5, 2025) (citing *Republic of Philippines v. N.Y. Land Co.*, 852 F.2d 33, 37 (2d Cir. 1988)).  Based on the Complaint, the Application, the Opposition, the Reply and all declarations and exhibits attached thereto, the Court makes the following preliminary findings of fact.

**I.      Spin Master**

Spin Master is the exclusive licensee of the '755 Patent, which includes the right to sue in its own name, Teixeira Decl. ¶ 3, ECF No. 145, and it has actively enforced its intellectual property interests, *id.* at ¶ 8; *see e.g. Spin Master, Ltd. v. E. Mishan & Sons, Inc.*, No. 19 Civ. 9035, 2019 WL 6681563 (S.D.N.Y. Dec. 6, 2019) (hereinafter "*EMSON*").  This patented technology has been

---

[1] All references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

used by Spin Master for over a decade in its Zero Gravity® toy cars to enable them to drive on walls and ceilings.  Teixeira Decl. ¶¶ 4-5.  Spin Master sells the Zero Gravity® toy cars on Amazon.com and Walmart.com.  *Id.* at ¶ 4.

Spin Master has received various industry awards for these toys.  For example, the Zero Gravity® toy was awarded the People's Play Award in the Radio Control category by TTPM in 2009; in 2014, Zero Gravity® vehicles earned the National Parenting Center's Seal of Approval; and in 2019, Zero Gravity® toy cars were named the Best Toy at Toy Fair 2019 by Popular Mechanics.  *Id.* at ¶ 7.  More recently, at least one market intelligence company has reported that Spin Master's wall-climbing gecko is in the top 10 toys in the United States in the remote control and vehicle category, which includes more than 1,380 other product listings.  Supp. Teixeira Decl. ¶ 5, ECF No. 180.  Since 2008, Spin Master has sold a substantial number of Zero Gravity® cars worldwide, including many in the United States.  *Id.* at ¶ 3.

Spin Master has worked to make its Zero Gravity® vehicles small, agile, and lightweight so they can effectively climb walls and ceilings.  Teixeira Decl. ¶ 6.  Since 2004, Spin Master has spent significantly on advertising its Zero Gravity® toys.  *Id.*

## II.    Accused Products

Defendants manufacture or sell numerous products that allegedly use the infringing technology, though they may have different decorative outer shells.  Teixeira Decl. ¶ 14; Levine Decl. ¶ 62.  These products are sold on Amazon.com and Walmart.com.  Teixeira Decl. ¶¶ 14-16.

Spin Master first learned of three of the Accused Products in 2022 and learned of most of the others in 2023.  *Id.* at ¶ 22.  Seeking to enforce its intellectual property rights, Spin Master participated in Amazon's then-required Amazon Patent Evaluation Express ("APEX") program.  *Id.* at ¶¶ 23-24.  After an informal review, Amazon decided not to remove the Accused Products.  *Id.* at ¶ 24.  Amazon's APEX program did not retain an expert, nor consider court rulings that were

favorable to Spin Master.  *Id.*  Spin Master appealed this decision and engaged in informal negotiations with Amazon to reach a resolution; Spin Master was partially successful in its efforts but was unable to find relief through Amazon directly with respect to the Accused Products and their manufacturers and/or sellers.  *Id.* at ¶¶ 25-32.

In 2025, Spin Master discovered Defendant Chenghai Lucky Boy Toys had begun manufacturing wall-climbing geckos that allegedly used the same technology and are also sold on Amazon.com.  Supp. Teixeira Decl. ¶ 7.

### III.    The '755 Patent

The United States Patent Act provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).  The '755 Patent has three claims that are at issue with respect to this motion.  Claim 1 in full recites:

> 1. A battery powered, remotely-controlled toy vehicle configured for operation on a substantially flat horizontal, vertical, and ceiling- like surface, comprising:
>
> a chassis having an undersurface and having flexible skirts extending along long sides of the chassis to provide a partial seal between the undersurface of the chassis and the surface;
>
> at least one wheel mounted on and cooperating with said chassis so as to support said chassis with respect to the substantially flat surface against which said at least one wheel bears, such that the undersurface of said chassis is maintained at a predetermined distance from said surface,
>
> a receiver responsive to a control signal from a remote transmitter,
>
> a battery,
>
> a first drive motor being supplied with current from said battery responsive to signals provided from said receiver,

at least one of said at least one wheel being controllably driven by said first drive motor,

a second fan drive motor, also being supplied with current from a battery, and

a fan driven by said second motor, said fan being mounted in a fan duct extending through said chassis and arranged generally orthogonally with respect to said surface, so as to draw a stream of air from between said undersurface of said chassis and said surface,

wherein said undersurface of said chassis is shaped so that when said vehicle is placed on a surface with said at least one wheel in contact with said surface, said undersurface and said surface together define an underbody venturi duct, said underbody venturi duct extending from an entry portion at the periphery of said undersurface to said fan duct, whereby differential pressure between said stream of air flowing in said underbody venturi duct and the ambient air induces downforce urging said chassis toward said flat surface; and

wherein the underbody venturi duct defined by said undersurface and said flat surface comprises (1) the entry portion extending between an inlet opening at the periphery of said underbody and a exit opening, (2) an extended transition portion, of substantially uniform cross-sectional area, joining the exit opening of said entry portion to (3) an exit portion, said exit portion being connected to said fan duct, whereby said fan draws said stream of air flowing freely through said underbody venturi duct, from said inlet opening of said entry portion to and out of said fan duct.

'755 Patent, col. 10, ECF 128-3.

Claim 6, which is dependent upon Claim 1, Pl.'s Supp. 11, recites in full:

6. The toy vehicle of claim 1, wherein said at least one wheel comprises a pair of drive wheels disposed substantially opposed from one another on either side of said chassis, and driven differentially by separate motors responsive to signals from said receiver to steer said vehicle.

'755 Patent, col. 11.

Claim 21, which is independent of Claims 1 and 6, Pl.'s Supp. 11, recites:

21. A battery powered, remotely-controlled toy vehicle configured for operation on a substantially flat horizontal, vertical, and ceiling-like surface, comprising;

a chassis having an undersurface and having flexible skirts extending along long sides of said chassis;

at least one wheel mounted on said chassis and cooperating therewith so as to support said chassis with respect to the substantially flat surface against which said at least one wheel bears, such that the undersurface of said chassis is maintained at a predetermined distance from said surface,

a receiver responsive to a control signal from a remote transmitter,

a battery,

a first drive motor being supplied with current from said battery responsive to signals provided from said receiver,

at least one of said at least one wheel being controllably driven by said first drive motor,

a second fan drive motor, also being supplied with current from a battery, and

a fan driven by said second motor, said fan being mounted in a fan duct extending through said chassis and arranged generally orthogonally with respect to said surface, so as to draw a stream of air from between said undersurface of said chassis and said surface,

wherein said undersurface of said chassis is shaped so that when said vehicle is placed on a surface with said at least one wheel in contact with said surface, said undersurface and said surface together define an underbody venturi duct extending from at least one inlet opening at the periphery of said undersurface, the undersurface in cross-section defining an entry section, an extended transition section, and an exit section, whereby the cross-sectional area of said underbody venturi duct varies smoothly from an inlet opening to a reduced area extended transition section, and thence to an exit section in communication with said fan duct, whereby differential pressure between said stream of air flowing in at least said transition portion of said underbody venturi duct and the ambient air induces downforce urging said chassis toward said flat surface.

'755 Patent, cols. 12-14.

The patent abstract describes that the toys' wall-climbing abilities are achieved through fans that "draw air from around all or defined portions of the periphery of the interior volume . . .

7

through a carefully-shaped duct, so that the air in the portion of the duct immediately adjacent the surface flows at high velocity and low pressure," which in turn "urges the vehicle against the surface" because of "the relatively greater pressure of the surrounding air." *Id.* at 1. The '755 Patent distinguishes their toy vehicles from other prior art that are "suction-adhering" because those rely on a "relative vacuum" which requires "an essentially air-tight seal . . . around the periphery of the device." *Id.*, col. 1. In contrast, the '755 Patent relies on Bernoulli's Principle, where "the air stream must be freely flowing to attain high velocity," and thus "employing a vacuum . . . [is] unnecessary." *Id.*, cols. 1-2.

## IV.    Prosecution History

The reliance on free-flowing air as opposed to the use of a vacuum was essential in overcoming rejections of the '755 Patent by the Patent and Trademark Office ("PTO"). The remarks to a December 11, 2009 amendment to the '755 Patent explain "that the fan(s) according to the invention are used to create flow, not to maintain a vacuum, as in the prior art." Defs.' Opp'n, Ex. 5 at 13, ECF No. 184-5. The remarks further discuss the prior art. For example, the remarks discuss Raviv, U.S. Patent No. 4,971,591, and note that it is "Raviv's intent to seal the lower edge of the cavity to the surface so that an effective vacuum can be maintained," which "is the exact opposite of the applicant's approach, wherein free flow of air through the venturi tunnel is essential to developing adequate downforce." Defs.' Opp'n, Ex. 5 at 15. Likewise, the remarks discuss Shino, U.S. Patent No. 3,926,277, stating that "Shino does not teach a device which creates downforce by way of a stream of air freely flowing through a venturi tunnel, but shows a vehicle urged against a surface by 'suction,' i.e., a vacuum . . . ." Defs.' Opp'n, Ex. 5 at 15.

8

## V.    Prior Art

Defendants argue that one prior art reference demonstrates the invalidity of the '755 Patent.[2]  Baocheng, China Utility Model No. CN2510135Y ("Baocheng"), was published in 2002 and is "a toy car with a chassis [1] made of a solid material, with attached wheels [4] for driving on a surface like a floor or a wall, and a driving motor [2] that powers the wheels."  Levine Decl. ¶ 70.  According to Defendants' expert, Baocheng "has a second motor [6] configured to drive a fan [9] that creates air flow that allows the car to easily drive up the wall."  *Id.*

## PRELIMINARY CONCLUSIONS OF LAW

## I.    Injunction Factors

In considering an application for preliminary injunction, the Court must evaluate the plaintiff's showing (1) for "a likelihood of success on the merits," (2) "that [the plaintiff] is likely to suffer irreparable injury in the absence of an injunction," (3) that "the balance of hardships tips in the plaintiff's favor," and (4) "that the public interest would not be disserved by the issuance of [the] injunction."  *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010).

### A.    Likelihood of Success

Likelihood of success on the merits of patent infringement claims requires a showing that the patent is (1) being infringed and (2) would survive any challenge to validity.  *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1364 (Fed. Cir. 2017); *see also Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009).  The Court concludes that Plaintiff has made an adequate showing on both fronts.  *See fuboTV Inc. v. Walt Disney Co.*, 745 F. Supp. 3d 109, 133 (S.D.N.Y. 2024) ("To establish a likelihood of success on the merits, a plaintiff need not

---

[2] The declaration of Defendants' expert, Joshua Levine, discusses three prior art reference, Levine Decl. ¶ 64-71, but in their briefing, Defendants only argue that one of them shows invalidity.  Defs. Opp'n 20-23.

show that success is an absolute certainty. It need only make a showing that the probability of . . .

prevailing is better than fifty percent.").

                1.      Infringement

                    *a.*      *Claim Construction*

"In construing claims, district courts give claims their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019). "[P]rosecution history may inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *EMSON*, 2019 WL 6681563, at \*11. "[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). Claim construction at the preliminary injunction stage need not be comprehensive or final, *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996), and no explicit construction is necessary if the construction is simple, or for claims whose meaning cannot be reasonably disputed, *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1322 (Fed. Cir. 2004).

In Claim 1, the language at issue recites:

> wherein said undersurface of said chassis is shaped so that when said vehicle is placed on a surface with said at least one wheel in contact with said surface, said undersurface and said surface together define an **underbody venturi duct**, said **underbody venturi duct** extending from an entry portion at the periphery of said undersurface to said fan duct, whereby differential pressure between said stream of air flowing in said **underbody venturi duct** and the ambient air induces downforce urging said chassis toward said flat surface; and

wherein the **underbody venturi duct** defined by said undersurface and said flat surface comprises (1) the entry portion extending between an inlet opening at the periphery of said underbody and a exit opening, (2) an extended transition portion, of **substantially uniform cross-sectional area,** joining the exit opening of said entry portion to (3) an exit portion, said exit portion being connected to said fan duct, whereby said fan draws said stream of air flowing freely through said **underbody venturi duct**, from said inlet opening of said entry portion to and out of said fan duct.

Pl.'s Supp. 8 (emphasis in original). In Claim 21, the language at issue recites:

wherein said undersurface of said chassis is shaped so that when said vehicle is placed on a surface with said at least one wheel in contact with said surface, said undersurface and said surface together define an **underbody venturi duct** extending from at least one inlet opening at the periphery of said undersurface, the undersurface in cross-section defining an entry section, an extended transition section, and an exit section, whereby the cross-sectional area of said **underbody venturi duct** varies smoothly from an inlet opening to a **reduced area extended transition section**, and thence to an exit section in communication with said fan duct, whereby differential pressure between said stream of air flowing in at least said transition portion of said **underbody venturi duct** and the ambient air induces downforce urging said chassis toward said flat surface.

Pl.'s Supp. 12 (emphasis in original).

The parties primarily disagree about whether the Accused Products utilize (1) a "stream of air" and whether they include (2) a "fan duct," and (3) "underbody venturi duct." As a preliminary matter, the Court largely adopts Defendants' construction of the term "stream of air," which they propose to be "a freely-flowing stream of air drawn from an area outside the periphery of the chassis via the inlet opening through the underbody venturi duct and exhausted through the fan duct." Levine Decl. ¶ 94. Plaintiff does not propose a different definition, but the Court—consistent with the ordinary meaning of term—further refines Defendants' construction to avoid using the term it seeks to define. Thus, the Court construes "stream of air" to be a continuous flow of air drawn from an area outside the periphery of the chassis via the inlet opening through the underbody venturi duct and exhausted through the fan duct.

11

The Court adopts Plaintiff's construction of "fan duct" as a fan located within a passageway that directs airflow.  Pl.'s Reply Mem. Law Supp. Prelim. Inj. ("Pl.'s Reply") 9-10, ECF No. 186. While Defendants offer a similar construction of "fan duct" as "a passageway for directing airflow that leads to the fan," Levine Decl. ¶ 88, they argue that the term "fan duct" also "require[s] a passageway extending further beyond the immediate thickness of the impeller." Defs.' Opp'n 19. But the Court can find no support within the Claims for Defendants' proposed additional requirement that the passageway extend beyond the thickness of the impeller.

Defendants claim that "underbody venturi duct" refers to the "carefully-shaped duct formed by the bottom of the car and the wall . . . that would tend to decrease air pressure on the constriction [between the chassis of the toy and the wall] . . . comprise[d] of an entry portion 50 a, a transition portion 50 b, and an exit portion 50 c, which makes a smooth transition into a fan duct 46, also of *venturi shape*, in which the fan(s) are located." Defs.' Opp'n 4 (emphasis in original).



*Id.* (citing '755 Patent, Col. 6:32–37, Fig. 12).  Defendants further define "venturi" under the '755 Patent as having "a specific 'shape' with three distinct sections with varying 'cross-sectional areas,' (i.e., distances from the driving surface)." *Id.* at 4-5.

Spin Master, on the other hand, takes a much broader understanding of "underbody venturi duct," contending that it should only be "construed to refer to the passageway between the chassis [of the toy] and adjacent surface that generates downforce sufficient to operate the toy vehicle along a wall or ceiling." Pl.'s Supp. 10.  Plaintiff argues that Defendants "read additional limitations into the claims" and that "[n]othing in Claim 1's definition of underbody venturi duct

requires entry, transition, and exit portions 'of varying cross-sectional areas,'" and that "Claim 21 also does not describe or limit the shape of its entry section, exit section, or inlet opening." Pl.'s Reply 5.

The prosecution history largely supports Defendants' construction of "underbody venturi duct." According to that history, "amendments [were] made to clearly distinguish the invention from the art of record." Defs.' Opp'n, Ex. 5 at 12. Indeed, the prosecution history explicitly refers to three distinct sections of the duct, stating that "[a]s is well known, . . . a venturi duct comprises at minimum an entry portion, an extended transition portion of smaller cross-sectional area, and an exit portion of larger cross-sectional area." *Id.* at 12-13. This specific shape, in combination with the flow of air, is what creates the pressure differential necessary to allow the toy vehicle to stick to vertical and ceiling-like surfaces in a manner that is distinct from a traditional vacuum. *Id.* However, to the extent Defendants argue "underbody venturi duct" requires "radiused" entry and exit portions, or that the distinct areas cannot include "sharp angles," the Court disagrees. As Spin Master correctly notes, nothing in the Claims specifically define the *shape* of each of those three distinct areas. *See* Pl.'s Reply at 5.

Thus, the Court construes "underbody venturi duct" to be a passageway between the chassis of the toy and the surface, comprised of three distinct areas—an entry portion, a transition portion, and an exit portion—of various distances from the surface. But the Court does not construe the term to require that these distinct areas each have particular or specific shapes.

### b. Comparison of Claims to Accused Products

Spin Master has adequately demonstrated for purposes of a preliminary injunction that each element of Claims 1, 6, and 21 of the '755 Patent are met by the Accused Products. Defendants argue that the Accused Products do not use the '755 Patent technology because their toys do not have a "venturi duct," they do not rely on a "stream of air," nor do they include a "fan duct" as

required by Claims 1, 6, and 21. Defs.' Opp'n 16-19. Based on the factual findings and Claim construction above, the Court disagrees.

In reviewing images and in examining the products directly, the Court preliminarily concludes for purposes of this stage of the litigation that the Accused Products have an "underbody venturi duct." Defendants argue that the bottoms of the Accused Products' chassis are flat, and that they therefore do not have three distinct cross-sectional areas, as is required for a venturi duct. *See* Defs.' Opp'n at 22. As noted by Plaintiff, however the chassis of the Accused Products does *not* appear to be completely flat, as Defendants contend. Pl.'s Reply 5. "Regarding Claim 1, the region surrounding the middle of the Accused Products' underbody (the 'exit portion') has a larger cross-sectional area than that of the transition portion. Nearing the exit portion, the surface is curved 'upward' (away from the wall) thereby increasing the cross-sectional area between the underbody and the wall." *Id.* at 5-6. While the change in the angle of the surface is relatively slight, the same appears to be true with respect to the entry portion. Indeed, "the ends and corners of the underbody flare away from—*i.e.*, are not parallel to—the wall. That flaring creates a larger cross-sectional area at each end and corner, than the cross-sectional area of the transition portion." *Id.* at 6.



*Id.*

The Court also preliminarily concludes that Plaintiff has adequately established, for the purpose of this stage of the litigation, that the Accused Products rely on a "stream of air," and that

they include a "fan duct."  As demonstrated in the claims chart, Cormier Decl. Ex. 5, ECF No. 177-5, the Accused Products contain fan ducts that create a stream of air that, when pushed through the venturi duct, creates "a lower pressure zone between the car and the wall surface."  Pl.'s Reply 7.  Defendants argue that the "skirts at the ends of the Accused Products' chassis . . . impede the flow of air through the alleged 'entry' portion," Levine Decl. ¶ 112, but Plaintiff adequately establishes that the gaps at the corner of the Accused Products, where the skirts do not meet, allow air to flow freely through the venturi duct.  Pl.'s Reply 8.

Because no other aspects of the Claims are disputed, the Court concludes that Spin Master has established a likelihood of infringement.  The Court notes that its conclusion in this regard is preliminary and not a final, binding one for later stages of litigation.  But Spin Master has met its burden as to a likelihood of infringement for purposes of preliminary relief.

2.    Validity

The Court also concludes that Defendants have failed to demonstrate patent invalidity. "In terms of the second prong of the infringement test, a patent is statutorily presumed to be prima facie valid. The burden is thus on the accused infringer to challenge the patent's validity." *Telebrands Corp. v. Guangzhou Alpaca Home Furnishing Co.*, No. 25 Civ. 3646, 2025 WL 1591970, at *5 (S.D.N.Y. June 5, 2025) (citing 35 U.S.C. § 282(a) and *Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 885 (Fed. Cir. 1984)).  Defendants argue that the '755 Patent is obvious, and therefore invalid.  According to Defendants, China Utility Model No. CN2510135Y ("Baocheng") "includes every element of Claims 1, 6, and 21" and those Claims "are nonetheless obvious in view of a skilled artisan's general knowledge of fluid dynamics."  Defs.' Opp'n 21-22.  But Baocheng does not include a venturi duct, as required by Claims 1 and 21 (as well a Claim 6, which is dependent on Claim 1).  Levin Decl. ¶ 134 ("Baocheng inherently contains a . . . flat bottom.").  Further, the commercial success of Spin Master's wall climbing toys, Pl.'s Supp. 2-4,

15

points towards non-obviousness. *EMSON*, 2019 WL 6681563, at *17 (finding the commercial success of Spin Master's Zero Gravity® cars to "weigh[] heavily in favor of . . . non-obviousness.").

Accordingly, Spin Master has established a likelihood of success on the merits of their patent infringement claim.

### B. Irreparable Harm

"[T]o satisfy the irreparable harm factor in a patent infringement suit, a patentee must establish both of the following requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012). Based on the showing of likely infringement, the Court concludes that irreparable harm is present and is clearly linked to Defendants' infringement. The Accused Products directly compete with those of Spin Master and are offered at a significantly lower price. The Federal Circuit has explained that "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). "Direct competition in the same market" is enough to "suggest[] strongly the potential for irreparable harm without enforcement of the right to exclude." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012).

Defendants primarily challenge irreparable harm on the basis of delay, pointing to various lags in the life cycle of this case. This case, has, admittedly, been drawn out, but the delays in question do not point to a lack of harm. For example, Plaintiff did not immediately file this lawsuit after becoming aware of the alleged infringement because Plaintiff was seeking alternative resolution through Amazon's APEX program and engaging in negotiations with Amazon's legal department. Pl.'s Supp. 22; Pl.'s Reply 11. Likewise, Defendants point to Plaintiff's delays in

16

filing its initial Motion for TRO/Preliminary Injunction, Defs.' Opp'n 9, but Plaintiff notes the parties were actively engaging in settlement negotiations during that time, Pl.'s Reply 11-12, and such "diligent pursuit of settlement negotiations can justify delay" in seeking preliminary relief. *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011).  Defendants argue Plaintiff delayed in effectuating proper service, Defs.' Opp'n 9, but Plaintiff had previously been, understandably, relying on a prior order authorizing service by alternative means, and the Court is satisfied with Plaintiff's explanation that any short delay between the Court's ruling vacating that prior order and initiating service pursuant to the Hague Convention was attributable to the time that it took to verify Defendants' addresses in China.  Tr. 5:24-6:6, ECF No. 189.  Thus, to the extent that there has been any delay, it has not been so undue as to defeat irreparable harm.

Accordingly, the Court finds that Spin Master has established irreparable harm.

### C.    Balance of the Equities and the Public Interest

"In determining whether the balance of the equities tips in the plaintiff's favor and whether granting the preliminary injunction would be in the public interest, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 178 (S.D.N.Y. 2022).  The Court concludes that these factors tip in favor of Spin Master here.  As another judge of this District concluded in another patent case,

> Absent an injunction, Plaintiff will continue to suffer reputational harm and impact to its market share, as outlined above.  Further, "the public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions." *Apple Inc. v. Samsung Electrs. Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015).  The benefit to the public in protecting patent rights stems from "not only [] the Patent Act's statutory right to exclude, which derives from the Constitution, but also [] the importance of the patent system in

17

encouraging innovation." *Id.* Here, the public interest would be best served by protecting patent rights and entering the injunction to prevent Defendants from manufacturing, promoting, and selling products that infringe Plaintiff's Pocket Hose Patent.

*Telebrands*, 2025 WL 1591970, at *7. All of these points are applicable here.

*    *    *

In sum, Plaintiff has adequately shown that it is likely to suffer irreparable harm as a result of Defendants' infringement. The public interest undoubtedly favors enforcement of Plaintiff's valid patent. Accordingly, the Court concludes that the equitable factors weigh in favor of preliminary relief. *See EMSON*, 2019 WL 6681563, at *18.

## CONCLUSION

To summarize, the Court concludes that Spin Master has successfully demonstrated that it is likely to succeed on its patent infringement claim and that the equitable factors favor preliminary injunctive relief. Thus, Spin Master's motion for preliminary injunctive relief is **GRANTED**. Within 21 days of this Order, the parties shall file a joint proposed Case Management Plan, available on the Court's website, detailing next steps in this litigation.

SO ORDERED.

Dated: January 27, 2026

New York, New York

_____
DALE E. HO
United States District Judge